

FILED
DISTRICT OF NEBRASKA
AT_____M
MAR - 8 2002
Gary D. McFarland, Clerk
By_____Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| THE TORO COMPANY, a Delaware Corporation, and EXMARK MFG. CO., INC., a Nebraska Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>SCAG POWER EQUIPMENT, INC., a Wisconsin Corporation, and METALCRAFT OF MAYVILLE, INC., a Wisconsin Corporation,<br><br>Defendants. | 8:01CV279<br><br>ORDER |

This matter is before the court on the defendants' motion for leave to depose Dennis Thomte, attorney for the plaintiffs (Filing No. 44) and the plaintiffs' motion for a protective order to prevent the deposition of Mr. Thomte (Filing No. 53). As more fully set forth below, the defendants' motion will be denied, and the plaintiffs' motion will be granted.

## BACKGROUND

The instant lawsuit is premised upon the defendants' alleged infringement of four United States patents. The patents involved in this action are United States Patent Numbers 5,133,176; 5,845,475; 5,987,863; and 5,822,961 (hereafter the '176, '475, '863, and '961 patents, respectively). The plaintiffs brought claims based upon infringement of the patent laws of the United States, 35 U.S.C. § 1, *et seq.* **See** Filing No. 1. The plaintiffs also sought a preliminary injunction against the defendants pursuant to 35 U.S.C. § 283 and Federal Rules of Civil Procedure Rule 65(a). **See** Filing No. 2.

The defendants seek to depose Dennis Thomte, trial counsel for the plaintiffs in this case. **See** Filing No. 44. The defendants allege Mr. Thomte has direct knowledge of

EDR RCU'D 03.11.02



EXHIBIT
9

factual matters in this case. Mr. Thomte prosecuted the applications for all the patents before the Patent and Trademark Office (PTO) except the '176 patent. The plaintiffs oppose the motion to depose Mr. Thomte. The plaintiffs have also filed a motion seeking a protective order to prevent the deposition at this time, subject to the defendants making a *prima facie* case of fraud on the part of the plaintiffs. **See** Filing No. 53. The court has received a brief in support of the motion to depose Mr. Thomte (Defendants' Brief) and a brief in support of the motion for a protective order (Plaintiffs' Brief). The parties stipulated to two extensions of time regarding submission of responses and briefs in this matter. **See** Filing Nos. 51 and 55. The parties also stipulated (Filing No. 51) to a reply from the defendant to the plaintiff's response brief (Defendants' Reply Brief), which the defendant has submitted to the court. The parties have filed numerous indices of evidence in this matter. Relevant to the present action are the Defendants' Index in support of the motion to depose Dennis Thomte (Filing No. 45), the Evidentiary Materials Filed in Support of the Plaintiffs' Opposition to the motion Cross-Motion for a Protective Order (Filing No. 54), the Defendants' Second Index in support of the motion to depose Dennis Thomte (Filing No. 57), and the Plaintiffs' Index in support of "Proper Construction" of the plaintiffs' claims (Filing No. 61).

The '475 patent relates to a multi-blade mower that can be converted from a side-discharge mower to a mulching mower through the use of removable mulching baffles. **See** Filing No. 61, Ex. A. The '475 patent protects "Y-shaped mulcher baffles which close the throat portions" of the mower deck. **See** Defendants' Brief at 4. The defendants suggest that in 1994 or 1995, the plaintiffs sold mulching kits, and the "prior art" with these kits contained Y-shaped mulching baffles. *Id.* The defendants claim these kits were prior art to the '475 patent because they were "in public use or on sale in this country, more than one year" before the patent application for the '475 patent, in violation of 35 U.S.C. § 102(b). *Id.* (quoting 35 U.S.C. § 102(b)). The plaintiffs claim the kits sold earlier utilized a "bird-wing" shaped baffle rather than a Y-shaped baffle and the two styles are substantially different. **See** Filing No. 54, Benson Declaration ¶¶ 6-17. Thus, the plaintiffs claim, they were not required to disclose the bird-wing shaped baffle as prior art. **See** Plaintiffs' Brief at 7-11.

2

EXM0008526

The '863 patent was issued for a multi-blade, side discharge mower deck with a front flow control baffle. **See** Filing No. 61, Ex. B. The patent has a baffle with a straight portion "angularly disposed with respect to said circle defined by the blade tip path of said second cutting blade in a chord-like fashion." *Id.* at col. 6:32-35. The defendants contend the "chord-like" baffle was contained in a prior art brochure from Walker Manufacturing Co. in 1995, prior to any patent application being filed. **See** Defendants' Brief at 6; Filing No. 45, Ex. 19. The plaintiffs argue the Walker brochure was disclosed to the PTO examiner as prior art. **See** Plaintiffs' Brief at 11-12. Indeed, the Walker brochure dated December 1996 is noted on the face of the '863 patent as cited prior art. **See** Filing No. 61, Ex. B. However, the defendants claim the listing refers to a different Walker brochure than the prior art contained in the 1995 Walker brochure, a difference they claim demonstrates bad faith on the plaintiffs' part. **See** Defendants' Brief at 7.

The '961 patent relates to a configuration for controls of the hydraulic pumps that independently power the wheels on a hydraulic-driven lawnmower. **See** Defendants' Brief at 7. The point of novelty of the pumps is that the "adjustment means" for each pump is located "on the connection means." **See** Defendants' Brief at 8; Filing No. 61, Ex. C at col. 6:56-57. The defendants claim defendant Scag had actually invented the product and had patented it as U.S. Patent 4,967,543, which became prior art to the plaintiffs' patent in '961. **See** Defendants' Brief at 8. The plaintiffs claim the defendants have taken "inappropriate creative license in defining the point of novelty of the '961 patent." **See** Plaintiffs' Brief at 12. The plaintiffs claim the point of novelty as described by the examiner was more than adjustment means "on" the connection means. *Id.*

## LEGAL STANDARD

### 1. Attorney Deposition

The federal rules do not forbid deposing the counsel of an opposing party. However, federal courts generally disfavor the practice of deposing a party's attorney. In fact, one circuit court of appeals has observed that the practice should be employed "only in limited circumstances." ***Theriot v. Parish of Jefferson***, 185 F.3d 477, 491 (5th Cir. 1999) (**citing *Shelton v. Am. Motors Corp.***, 805 F.2d 1323, 1327 (8th Cir. 1986)). The Eighth Circuit

3

EXM0008527

has set the standard for such depositions in **Shelton**, where the plaintiff sought to depose the defendant's in-house counsel. The Eighth Circuit stated:

> In recent years, the boundaries of discovery have steadily expanded, and it appears that the practice of taking the deposition of opposing counsel has become an increasingly popular vehicle of discovery. To be sure, the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition. **See** Fed. R. Civ. P. 30(a) (a party may take the deposition of "any person"). We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances.
>
> * * * *
>
> We recognize that circumstances may arise in which the court should order the taking of opposing counsel's deposition. But those circumstances should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.

**Shelton**, 805 F.2d at 1327 (emphasis added). Recently, the Eighth Circuit has described the **Shelton** standard as a "difficult burden . . . intended to guard against the 'harassing practice of deposing opposing counsel . . . that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process.'" **Pamida, Inc. v. E.S. Originals, Inc.**, 2002 WL 257373, at *2 (8th Cir. Feb. 25, 2002) (**quoting Shelton**, 805 F.2d at 1330). Furthermore, even where information sought is shown to be nonprivileged and crucial, a party's failure to establish that the attorney deposition is the only reasonably practical means available for obtaining the information will defeat an attempt to depose opposing counsel. **Simmons Foods, Inc. v. Willis**, 191 F.R.D. 625, 630 (D. Kan. 2000) (applying **Shelton** test).

4

EXM0008528

2.   **Protective Order**

District courts have broad discretion to limit discovery and decide discovery motions. **Pavlik v. Cargill, Inc.**, 9 F.3d 710, 714 (8th Cir. 1993); **Lee v. Armontrout**, 991 F.2d 487, 489 (8th Cir. 1993); **Wishon v. Gammon**, 978 F.2d 446, 448 (8th Cir. 1992). The court's discretion to limit the scope of discovery exists so long as it has a good reason to do so. **Credit Lyonnais v. SGC Int'l, Inc.**, 160 F.3d 428, 431 (8th Cir. 1998). Furthermore, for good cause shown, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." See Fed. R. Civ. P. 26(c). These protective orders may include a complete prohibition against certain discovery or imposition of some specified method by which discovery is to be conducted. See Fed. R. Civ. P. 26(c)(1) and (3). The deposition of a party's attorney falls into the category of those occasions where the court may make these orders. Indeed, one court has noted: "[w]hile the Federal Rules do not prohibit the deposition of an attorney for a party, experience teaches that countenancing unbridled depositions of attorneys often invites delay, disruption of the case, harassment, and unnecessary distractions into collateral matters." **Simmons Foods**, 191 F.R.D. at 630 (citations omitted). One district court notes the Eighth Circuit has offered criteria to consider when courts are requested to issue protective orders:

> Fed. R. Civ. P. 26(c) requires that "good cause" be shown for a protective order to be issued. The burden is therefore upon the movant to show the necessity of its issuance, which contemplates "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements . . . ." Such determination must also include a consideration of the relative hardship to the non-moving party should the protective order be granted.

**DeJong v. Bell Helicopter Textron, Inc.**, 124 F.R.D. 207, 208 (W.D. Mo. 1988) (**quoting** **Gen. Dynamics Corp. v. Selb Mfg. Co.**, 481 F.2d 1204 (8th Cir. 1973), **cert. denied**, 414 U.S. 1162 (1974)).

EXM0008529

## ANALYSIS

In the present case, the defendants seek to depose a patent attorney, Dennis Thomte, regarding his actions surrounding the issuance of several patents at issue in this case. The defendants claim Mr. Thomte did not provide to the PTO all material information regarding the applications for four patents. The defendants allege the failure to provide all this information constitutes inequitable conduct on Mr. Thomte's part, entitling the defendants to abrogate the attorney-client privilege and depose Mr. Thomte.

The plaintiffs move for a protective order to prevent Mr. Thomte's deposition at this time, without prejudice to the right of the defendants to reassert the motion to depose Mr. Thomte if other means of discovery prove insufficient. **See** Plaintiffs' Brief at 2. The plaintiffs assert the defendants are attempting to gain information protected under the attorney-client privilege. **See** *id.* at 3. Further, the plaintiffs argue communications between a client and a patent attorney are protected just the same as those between a client and any other attorney. **See** *id.*

### The *Shelton* Test

Under the test set forth in ***Shelton***, the defendants face a demanding burden to demonstrate 1) *no* other means exist to obtain the information than to depose opposing counsel, (2) the information sought is relevant and *nonprivileged*, and (3) the information is *crucial* to the preparation of the case. ***Shelton***, 805 F.2d at 1327 (emphasis added). The ***Shelton*** court opined that the "increasing practice of taking opposing counsel's deposition [is] a negative development in the area of litigation, and one that should be employed only in limited circumstances." *Id.* As illustrated more fully below, the present case is not one which presents such limited circumstances.

### 1.   No Other Means

The defendants cannot meet the first condition from ***Shelton***, as nothing in the record indicates the information sought cannot be obtained by means other than deposing the plaintiffs' attorney. As explained in ***Simmons Foods***, even where information sought is shown to be nonprivileged and crucial, failure to establish that the attorney deposition is

6

EXM0008530

the only reasonably practical means available for obtaining the information will defeat an attempt to depose opposing counsel. **Simmons Foods**, 191 F.R.D. at 637-38. The defendants seek testimony from Mr. Thomte "concerning his knowledge, intent, and actions in prosecuting the patents in suit before the PTO." **See** Filing No. 44. The defendants assert the deposition is necessary because Mr. Thomte was a percipient witness with direct knowledge of factual matters at issue in this case. **See id.** However, further information can clearly be gained from other sources, including Garry Busboom, the inventor, who has already been deposed regarding the prosecution of the patents, the prior art, and disclosure of relevant information, or Rodney Benson, one of the plaintiffs' engineers. **See** Filing No. 54; Plaintiffs' Brief at 13-14. Even the Defendants' Briefs note that Mr. Busboom is another person possessing information about the relevant materials. The Defendants' Briefs, though arguing Mr. Busboom had no knowledge of Mr. Thomte's intentions and state of mind, do not address the defendants' contentions that Mr. Busboom has knowledge of the other information sought aside from Mr. Thomte's intent and state of mind. The defendants also do not address the knowledge they could gather from Mr. Benson, who has submitted a declaration regarding the patents in suit. **See** Filing No. 54.

As to the information which only Mr. Thomte allegedly possesses, the defendants have shown no need for additional information concerning Mr. Thomte's state of mind because they have not shown any fraud before the PTO by the plaintiffs, as more fully discussed below. An arrant statement that Mr. Thomte was evasive or deceptive before the PTO is insufficient to prove those allegations. Simply because the defendants seek more information than is presently available to them does not mandate permitting the defendants to depose the attorney for the opposition. Furthermore, even if the deposition of Mr. Thomte is the only possible way for the defendants to obtain the information they seek, nearly three months remain until the close of discovery. **See** Filing No. 67. As discovery draws to a close, the defendants will be in a better position to determine whether or not the deposition of Mr. Thomte is necessary.

In the **Pamida** case, the plaintiff chose to use the same law firm in its lawsuit against the defendant as it had used to defend a previous suit. **Pamida**, 2002 WL 257373, at *3. The court noted the issue in the second suit was over the attorneys' fees from the first

EXM0008531

action. *Id.* The plaintiff was held to have waived the attorney-client privilege with regard to attorneys' fees when it put the amount of those fees at issue in the second matter. *Id.* The defendant in that case was "primarily seeking information regarding the concluded patent infringement case, not the [then-]pending indemnification action." Furthermore, the defendant was "seeking to depose opposing counsel to discover information peculiarly within counsel's knowledge and centrally relevant to the issues in the indemnification action, i.e., whether the $750,000 in attorneys' fees incurred in defending the patent infringement action was reasonable and what action was taken to notify [the defendant] of the patent infringement action and [the plaintiff's] claim for indemnification." *Id.* In such circumstances, the court noted "deposing opposing counsel may not only be the most expedient approach, but the only realistically available approach." *Id.*

The defendants cite to the district court case from *Pamida*, which explained that *Shelton* stood for the proposition that a party cannot prevent a material witness from being deposed by hiring the witness as a trial attorney. **See** Defendants' Brief at 18-19 (citing *Pamida, Inc. v. E.S. Originals, Inc.*, 199 F.R.D. 633, 635 (D. Minn. 2001)). As noted above, the attorneys named as witnesses in *Pamida* were the attorneys in an already-concluded lawsuit. The attorneys were being called as witnesses in the second suit to testify about issues that were "central to" the second case. *Pamida*, 2002 WL 257373, at *2. Their testimony related to what actions Pamida had taken with regard to the first lawsuit as well as the reasonableness of attorneys' fees the attorneys had charged in the first suit. *Id.* at *1. As noted above, the Eighth Circuit ruled these issues were those committed to the knowledge of the attorneys more than to any other party. *Id.* at *3. The *Pamida* court carefully distinguished the case before it and the *Shelton* case, noting that in the case before it, the opposing party was seeking to depose the attorneys regarding their representation activities in a concluded lawsuit. *Id.* at *3. Further, the court ruled that, although *Shelton* did not govern the case before it, the information sought from the attorneys could only be had upon a showing under Rule 26(b)(3) or upon waiver of the attorney-client privilege.

The instant case, however, presents a different situation altogether. The defendants argue Mr. Thomte is a percipient witness in this case, Mr. Thomte's actions in prosecuting

8
EXM0008532

the patents are relevant, and Mr. Thomte's knowledge of the prior art and the reasons for not disclosing it are directly at issue in this case. **See** Defendants' Brief at 19. The defendants claim the plaintiffs have named Mr. Thomte as trial counsel in this matter in an attempt to prevent cross-examination of Mr. Thomte's testimony "as to his excuses for not disclosing the art in his briefs and arguments presented to this Court." **See** Defendants' Brief at 19.

Information regarding the disclosure of prior art is available from other sources. Mr. Busboom, the inventor, has information available to him regarding prior art. Mr. Benson, the plaintiffs' Chief Engineer, also has information regarding the prior art. Still, the defendants argue Mr. Thomte is the only one who can testify regarding his own knowledge and intent in making the patent applications. **See** Defendants' Reply Brief at 13. While this is quite likely true, Mr. Thomte's knowledge and intent are not at issue absent a showing of fraud or inequitable conduct on his part. The defendants have not sufficiently made this showing, as more fully set forth below. The defendants make numerous assertions, all stating relatively the same thing: Mr. Thomte is a percipient witness whose inequitable conduct before the PTO was the driving force behind the issuance of several patents. **See** Defendants' Brief at 10-20; Defendants' Reply Brief at 2-15. Simply repeating the same allegation throughout two briefs does not make the allegation more valid. It does, however, point to the lack of evidence in support of the allegation. The defendants have not demonstrated that Mr. Thomte possesses more knowledge than the average patent attorney who prosecutes an application with the PTO. The allegation that the plaintiffs took the action of naming Mr. Thomte as trial counsel for the purpose of frustrating discovery is without merit. The defendants' allegations that Mr. Thomte is a percipient witness are no stronger than those that could be made of any patent attorney who prosecutes an application with the PTO. The defendants make no charge that Mr. Thomte has a conflict of interest in this matter, nor does the court find any such conflict. Without such, the court finds no basis for the assertion that Mr. Thomte was improperly named as trial counsel for the plaintiffs. Were it that parties to litigation could depose opposing counsel whenever counsel was known to have received information from the client that was not available to the other side, the defendants' argument would be valid.

9

EXM0008533

Such is not the situation here. Thus, the court finds the defendants have other reasonable means available to them to garner the information they seek other than the deposition of Mr. Thomte. The defendants have not met the burden placed upon them under the first part of the *Shelton* test.

### 2. Attorney-Client Privilege in Patent Litigation

The attorney-client privilege exists when certain fundamental characteristics of a relationship between an attorney and his client have been met. The Eighth Circuit has held:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Diversified Ind., Inc.*, 572 F.2d 596, 601 (8th Cir. 1977) (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)).

One district court described the privilege in this way: "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor except the protection be waived." *Wonneman v. Stratford Sec. Co.*, 23 F.R.D. 281, 285 (S.D.N.Y. 1959).

In patent litigation, the attorney-client privilege is often viewed as operating differently than in other contexts. However, many authorities believe the privilege should apply with no less force in the patent arena than in any other area of an attorney's work.

> Where a lawyer possesses multifarious talents, his clients should not be deprived of the attorney-client privilege, where applicable, simply because their correspondence is also concerned with highly technical matters. Patent lawyers should not be banished to the status of quasi-lawyers by

EXM0008534

> reason of the fact that besides being skilled in the law, they are also competent in scientific and technical areas.

**See** Daniel A. DeVito & Michael P. Dierks, Exploring Anew the Attorney-client Privilege and Work-product Doctrine In Patent Litigation: The Pendulum Swings Again, This Time in Favor of Protection, **22 AIPLA Q.J.** 103, 113 (1994). The authors then noted that many courts have begun to recognize the privilege should apply with full force, observing:

> No one credibly could dispute that, in litigating a patent suit in federal court, a patent attorney's practice of law mirrors that of attorneys who litigate other types of lawsuits. As a general principle, the applicability of the attorney-client privilege and work-product doctrine to activities carried out and materials prepared in the course of litigating a patent lawsuit in federal court is unassailable. However, courts historically have questioned the applicability of this principle to many prelitigation aspects of a patent attorney's or patent agent's practice, including drafting patent applications, making determinations of patentability of an invention, or analyzing issues of infringement.
> Since the **Sperry** decision, however, an increasing number of courts appreciate the true legal function of patent prosecution practice in delicately crafting a document upon which a legal right is created. Increasingly, courts recognize that patent practitioners function as lawyers with respect to every aspect of their practice and accept the applicability of discovery privileges in the context of disputes concerning patent prosecution materials. The road to this recognition, though, has not been straight or easy. Instead, the road shows conflict between two landmark cases and confusion among the lower courts and the Federal Circuit.

**See** DeVito & Dierks, **supra**, at 104-05 (citations omitted). Indeed, it is now widely recognized that prosecution of a patent application is protected by the privilege because it involves some amount of attorney work. One court has noted that "communications from inventor to patent lawyer, even those that are entirely technical, remain presumptively protected by the attorney-client privilege." **Advanced Cardiovascular Sys. Inc. v. C.R. Bard, Inc.**, 144 F.R.D. 372, 378 (N.D. Cal. 1992). "Significantly, a principal consideration informing this change in the majority view has been an acknowledgment that helping an inventor prepare a patent application and prosecute a patent can involve at least some

11

EXM0008535

work that is fairly characterized as lawyering." ***Advanced Cardiovascular***, 144 F.R.D. at 375 (**citing *Knogo Corp. v. U.S.***, 213 U.S.P.Q. 936, 940-41 (Ct. Cl. 1980)).

Initially, the court will determine whether the attorney-client privilege applies to communications between a client seeking to perfect a patent with the PTO and that client's patent attorney. Such a determination is necessary because of the history of courts questioning the applicability of the privilege to the prelitigation aspects of a patent attorney's practice. **See** DeVito & Dierks, ***supra***, at 104. The court notes the majority of other courts have held the privilege applies to the prelitigation context of patents in the same way it applies in any other context. ***Advanced Cardiovascular***, 144 F.R.D. at 375. **See, e.g., *Ryobi N. Am., Inc. v. Emerson Elec. Co.***, 7 F. Supp.2d 1019 (W.D. Mo. 1998); ***Rohm & Haas Co. v. Brotech Corp.***, 815 F. Supp. 793 (D. Del. 1993), **aff'd**, 19 F.3d 41 (Fed. Cir. 1994); ***Fromson v. Anitec Printing Plates, Inc.***, 152 F.R.D. 2 (D. Mass. 1993); ***Cuno, Inc. v. Pall Corp.***, 121 F.R.D. 198 (E.D.N.Y. 1988); ***Hydraflow, Inc. v. Enidine Inc.***, 145 F.R.D. 626 (W.D.N.Y. 1993); ***Minnesota Mining & Mfg. Co. v. Ampad Corp.***, 7 U.S.P.Q.2d (BNA) 1589 (D. Mass. 1987); ***FMC Corp. v. Old Dominion Brush Co.***, 229 U.S.P.Q. (BNA) 150 (W.D. Mo. 1985); ***Knogo***, 213 U.S.P.Q. at 940-41. The court believes the role of a patent attorney in the prelitigation patent application process is more than simply that of a scrivener; an attorney's role in the process is primarily legal in nature. **See *Advanced Cardiovascular***, 144 F.R.D. at 377-78.

While not conceding the privilege applies, the defendants argue the plaintiffs waived the attorney-client privilege by producing otherwise privileged documents. **See** Defendants' Brief at 15. The defendants assert the plaintiffs' fraud before the PTO eviscerates the privilege with regard to Mr. Thomte's knowledge. **See *id.*** at 17. Finally, the defendants allege Mr. Thomte's arguments before the court regarding an earlier motion for preliminary injunction served to waive the privilege. **See *id.***

The defendants' first argument is based on the fact that the plaintiffs produced in discovery certain documents concerning prior art. **See *id.*** at 15. The defendants argue that disclosure is inconsistent with confidentiality and waives the attorney-client privilege. ***Id.*** (quoting ***Lutheran Med. Ctr. of Omaha v. Contractors, Laborers, Teamsters and Eng'rs Health and Welfare Plan***, 25 F.3d 616, 622 (8th Cir. 1994)). The defendants'

12

EXM0008536

statement of the law is accurate, but misses the point of **Lutheran Medical**. That case stated the actual document that was provided accidentally as part of discovery was not protected by the privilege. **Lutheran Medical**, 25 F.3d at 622. The court there did not, however, hold that the production of the document waived the privilege as to all communications between a client and his attorney. The plaintiffs in the instant case produced a document sent from a representative of the plaintiffs to Mr. Thomte, which could potentially be related to prior art of the patents in suit. **See** Filing No. 26 (Sealed), Husmann Declaration, Ex. 14-L; Filing No. 45, Second Husmann Declaration, Ex. 22. The plaintiffs here did not seek to have the document returned to them and, thus, the court will presume the document was intentionally rather than inadvertently sent to the defendants as part of discovery.

The Supreme Court, in **Upjohn Co. v. United States**, held that the attorney-client privilege does not protect the facts underlying a client's communications with an attorney. 449 U.S. 383, 395 (1981). "The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." **Upjohn**, 449 U.S. at 396 (**quoting Philadelphia v. Westinghouse Elec. Corp.**, 205 F. Supp. 830, 831 (E.D. Pa. 1962)). The Court also cited to the Wisconsin Supreme Court, which had previously held "that a party cannot conceal a fact merely by revealing it to his lawyer." **State ex rel. Dudek v. Circuit Court**, 150 N.W.2d 387, 399 (Wis. 1967). The document at issue in the instant case related to prior art and the inventions *sub judice*. **See** Defendants' Brief at 15. The disclosure of this document is insufficient to waive the privilege with regard to any communications outside the document itself. To the extent the aforementioned document contained any information the plaintiffs previously might have sought to protect, the protection of the information has been waived. However, the attorney-client privilege has attached to materials other than just this single document, and the single document's disclosure does not, in this case, serve to waive the privilege with respect to all other communications.

Secondly, the defendants argue Mr. Thomte's inequitable conduct before the PTO permits piercing of the privilege. The plaintiffs point out inequitable conduct is adequate

EXM0008537

to render a patent unenforceable, but is not sufficient to pierce attorney-client privilege. **See** Plaintiffs' Brief at 6. **See also** Defendants' Brief at 10 (noting that inequitable conduct renders a patent unenforceable). In order to breach the attorney-client privilege, a *prima facie* case of fraud, rather than inequitable conduct, must be shown. **Am. Optical Corp. v. United States**, 179 USPQ 682, 684 (Ct. Cl. 1973). A *prima facie* case for fraud requires the moving party prove "(1) a knowing, willful, and intentional act of misrepresentation or omission before the Patent Office; (2) that is material; and (3) that the Patent Office relied upon [the misrepresentation or omission] in deciding to issue the patent." **Stryker Corp. v. Intermedics Orthopedics, Inc.**, 148 F.R.D. 493, 497 (E.D.N.Y. 1993) (**citing Bulk Lift Intern. Inc. v. Flexcon & Sys., Inc.**, 122 F.R.D. 493, 495 (W.D. La. 1988)). "Unsupported assertions that these elements have been met are insufficient to pierce the privilege." **Stryker**, 148 F.R.D. at 497 (**citing Rohm and Haas Co. v. Dawson Chem. Co.**, 214 U.S.P.Q. 56, 60 (S.D. Tex. 1981)). In fact, each element must be established by a *prima facie* showing. **Id.**

In **Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.**, the Supreme Court explained the concept of fraud as regards patent litigation. 382 U.S. 172, 177 (1965). The Federal Circuit, applying this analysis, explained: "Consistent with the Supreme Court's analysis in **Walker Process**, as well as Justice Harlan's concurring opinion, we have distinguished 'inequitable conduct' from **Walker Process** fraud, noting that inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a **Walker Process** counterclaim. . . . Inequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than 'knowing and willful' fraud." In re **Spalding Sports Worldwide, Inc.**, 203 F.3d 800, 807 (Fed. Cir. 2000) (**quoting Nobelpharma AB v. Implant Innovations, Inc.**, 141 F.3d 1059, 1069 (Fed. Cir. 1998)). The **Walker Process** Court noted the concept of fraud was most often used by courts to refer to conduct so reprehensible that the conduct alone could form the basis for an actionable wrong. **Spalding**, 203 F.3d at 807. The Federal Circuit explained:

> Because severe penalties are usually meted out to the party found guilty of such conduct, [common law] fraud is generally held not to exist unless the following indispensable elements are found to be present: (1) a representation of a material fact,

14

EXM0008538

> (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation.

*Id.* (quoting *Nobelpharma*, 141 F.3d at 1069).

The court finds the Defendants' Brief to state the correct legal framework for determining the enforceability of a patent, inequitable conduct, but it did not convey the proper test for piercing the attorney-client privilege, fraud. The Defendants' Reply Brief alleges the defendants have made the *prima facie* showing of fraud. **See** Defendants' Reply Brief at 4. In actuality, however, the defendants have made nothing more than a series of allegations of wrongdoing on Mr. Thomte's part. These allegations do not find sufficient support in the evidence presented. The allegations themselves do not rise to the level of a *prima facie* showing of fraud on Mr. Thomte's behalf. Furthermore, the court believes, due to the serious nature of allegations of fraud, the determination of whether the plaintiffs committed fraud upon the PTO is more properly committed to proceedings other than a discovery dispute. As to the context of this discovery dispute, the court does not believe the defendants have made the *prima facie* case on the issue of fraud. Thus, the court will not pierce the attorney-client privilege on the basis of fraud.

Third, the defendants claim Mr. Thomte's arguments before the court regarding the motion for preliminary injunction and the plaintiffs' brief in support thereof sufficed to waive the attorney-client privilege. The defendants contend some arguments Mr. Thomte made in the brief in support of the motion waived privilege because no citation or legal authority was given in support of the arguments. **See** Defendants' Brief at 16. The defendants also maintain arguments Mr. Thomte made during oral argument, where he stated that the plaintiffs' products were "completely different than [sic] that which was patented," waived the privilege. *Id.* The plaintiffs argue comments made by Mr. Thomte during oral argument were argument only, and not sworn personal testimony. **See** Plaintiffs' Brief at 5. The plaintiffs claim the statements made during the argument related to facts at issue in the case, which are not covered by the attorney-client privilege at all. *Id.* Thus, the

EXM0008539

plaintiffs contend, because the statements were never covered by the privilege, their subsequent revelation cannot serve as a waiver of the privilege. *Id.* Finally, the plaintiffs argue that if attorney argument served to waive the attorney-client privilege, the privilege would be meaningless. *Id.*

In *Upjohn*, the Supreme Court held that the privilege protects only disclosure of communications between a client and an attorney but "does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395. The Court continued:

> Here the Government was free to question the employees who communicated with [in-house attorney] and outside counsel. Upjohn has provided the IRS with a list of such employees, and the IRS has already interviewed some 25 of them. While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege.

*Upjohn*, 449 U.S. at 396. In the present case, the defendants are free to depose the plaintiffs' employees and inventors to ascertain their level of knowledge regarding the patents. Although the defendants state they seek to ascertain Mr. Thomte's state of mind regarding the applications, they do not show they have questioned the plaintiffs' inventors or officers to discover whether the alleged wrongdoing was commited at their direction. Simply because Mr. Thomte makes representations to the court about the plaintiffs' contentions with regard to the patents in suit does not necessitate a finding that attorney-client privilege has been waived. The defendants seek to have the court create a rule that would permit the defendants to accuse to plaintiffs' attorney of improprieties, then use the arguments the plaintiffs' attorney makes to defend that accusation to serve as the basis for waiver of the attorney-client privilege. The defendants do not provide any caselaw in support of the contention that Mr. Thomte's arguments to the court can serve as the basis for waiver of privilege. The court finds this contention to be unfounded. Thus, the court finds Mr. Thomte's arguments before the court do not work as a relinquishment of the attorney-client privilege.

EXM0008540

### 3. Crucial Information

Finally, the defendants have alleged the information sought from the deposition of Mr. Thomte is crucial to this case. **See** Defendants' Brief at 18. Although the plaintiffs question the cruciality of the deposition because the defendants have alleged numerous defenses that require no information from Mr. Thomte, this contention is unfounded. **See** Plaintiffs' Brief at 14. The knowledge of and participation by Mr. Thomte in the incidents involved most certainly would have a bearing on this case, as he was intimately involved in the issuance of the patents in question. Whether the information is crucial to the case is also beyond doubt, as Mr. Thomte is one of a small number of people involved whose knowledge could be case-determinative. While the defendants' argument may be well-founded, the **Shelton** standards are phrased in the conjunctive rather than the disjunctive. A party must meet *all* parts of the **Shelton** test in order to be permitted to depose opposing counsel. The plaintiff satisfies only this one of the three parts of the test. Thus, the deposition of Mr. Thomte shall not be had at this time.

The occasions when the deposition of the opposing party's attorney is permitted are limited to those times when "(1) no other means exist to obtain the information than to depose opposing counsel . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." **Shelton**, 805 F.2d at 1327. Here, while the information sought is likely to be relevant and might possibly even be crucial to the case, the defendants have failed to prove no other means exist to obtain the information or the information is not privileged.

The Eighth Circuit has repeatedly held that courts have broad discretion to limit discovery and to decide discovery motions. **Pavlik**, 9 F.3d at 714; **Lee**, 991 F.2d at 489; **Wishon**, 978 F.2d at 448. The court's discretion to limit the scope of discovery exists so long as it has a good reason to do so. **Credit Lyonnais v. SGC Int'l, Inc.**, 160 F.3d 428, 431 (8th Cir. 1998). "Because of liberal discovery and the potential for abuse, the federal rules 'confer[ ] broad discretion on the [district] court to decide when a protective order is appropriate and what degree of protection is required.'" **Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2**, 197 F.3d 922, 925 (8th Cir. 1999) **(quoting Seattle Times Co. v. Rhinehart**, 467 U.S. 20, 36 (1984)). Due to the nature of the discovery dispute in this

EXM0008541

nature, the court believes a protective order is proper in this case. Hence, the defendants' motion to depose attorney Dennis Thomte shall be denied and a protective order shall be issued to prevent the deposition at this time. Accordingly,

**IT IS ORDERED:**

1. The defendants' motion for leave to depose Dennis Thomte, attorney for the plaintiffs, (Filing No. 44) is denied without prejudice.

2. The plaintiffs' motion for a protective order to prevent the deposition of Mr. Thomte (Filing No. 53) is granted. The deposition of Mr. Thomte shall not be had except upon further order of this court.

### ADMONITION

Pursuant to NELR 72.3 any appeal of this Order shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Order. Failure to timely appeal may constitute a waiver of any objection to the Order. The brief in support of any appeal shall be delivered to Judge Joseph F. Bataillon at the time of filing such appeal. Failure to submit a brief in support of any appeal may be deemed an abandonment of the appeal.

DATED this 8th day of March, 2002.

BY THE COURT:

THOMAS D. THALKEN
United States Magistrate Judge

EXM0008542