IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EXMARK MANUFACTURING COMPANY INC., | |
| Plaintiff, | **8:10CV187** |
| vs. | **MEMORANDUM AND ORDER** |
| BRIGGS STRATTON POWER PRODUCTS GROUP, LLC;  SCHILLER GROUNDS CARE, INC., | |
| Defendants. | |

This matter is before the court on the defendants' joint motions to exclude the opinions of Melissa Bennis, Filing No. 416, and of Paul Strykowski and Garry Busboom, Filing No. 354. This is an action for patent infringement. This court has jurisdiction under 28 U.S.C. § § 1331, 1332(a)(1) and 1338(a).

I.  BACKGROUND

Relevant facts are set forth in the court's earlier orders and need not be repeated here. This action involves a patent for an improved lawn mower structured in a certain way. The invention is a side discharge mower with front and rear baffles within the mower deck that direct the flow of air and grass clippings from one cutting chamber into the path of the next cutting chamber. Filing No. 1, Ex. A, '863 patent at 4:37-64, 6:32-39, 8:1-14. Exmark alleges that Briggs and Schiller have infringed claims 1, 2, 6, and 7 of the subject patent. It is seeking reasonable royalty damages for that infringement.

Melissa Bennis is the plaintiff's damages expert. She has prepared a reasonable royalty opinion and analysis. Defendants move to exclude Bennis's opinions, arguing that she does not correctly apply the Entire Market Value Rule ("EMVR") and she fails to apportion between patented and non-patented features of the accused lawn mowers.

Defendants also move to exclude the opinions and testimony of Paul Strykowski (a professor of mechanical engineering with a focus on fluid mechanics) and Garry Busboom (the inventor). They argue that the experts are not qualified and their testimony is unreliable because they are not based on objective standards but simply personal views.  Also, they contend Strykowski is not a person of ordinary skill in the art of lawn-mower design. Defendants also argue that if the both experts are found qualified and reliable, Exmark can only rely on one of them because their testimony would be needlessly cumulative.

Melissa Bennis is a Principal at Davis & Hosfield Consulting LLC, a firm that specializes in financial consulting within the litigation and dispute resolution process.  Filing No. 461-1, Ex. 1, expert report and Disclosure of Melissa A. Bennis.  She has a Bachelor of Science degree in Finance with Honors from the University of Illinois at Urbana-Champaign and a Masters of Business Administration degree with majors in Accounting, Marketing, and Management and Strategy from the Kellogg School of Management, Northwestern University.  *Id.*  She is also a licensed Certified Public Accountant and a member of the American Institute of Certified Public Accountants, the Illinois CPA Society, the American Bar Association, and the Licensing Executives Society.  *Id.*

Bennis's opinion is based on a hypothetical negotiation, constructed using the Georgia-Pacific factors and additional factors that the hypothetical negotiators would have considered.  *See Id.* at 21-57.  Bennis considered settlement agreements as part of her analysis.  *Id.* at 33.  She used the entire mower as the royalty base.  *Id.* at 118-119.  She attempted to take into account all of the different factors. Id. at 208.  She stated the royalty was structured as a percentage of sales, intended to have variability depending on the overall price of the mower.  *Id.* at 213.  She based her calculation on the understanding that the patented flow control baffle allows the mower to provide a quality of cut that is desired

and demanded by the marketplace.  *Id.* at 251; *see also* Filing No. 419-2, Bennis Report at 54 (stating "the quality of cut is paramount to selling mowers."); Filing No. 419-3, Ex. 2, Deposition of Melissa A. Bennis at 23. In her report, she acknowledged that "[o]ther elements also affect sales and profits of mowers," noting that deck performance and maintenance are factors, as well as brand and dealer support, warranty and durability, a distribution dealer network, productivity, performance, and brand position.  Filing No. 419, Ex. 2, Bennis Report at 54.  She also acknowledged that Schiller and Briggs have patents on certain other elements of their mowers that "do not relate to the quality of the cut provided by the mower."  *Id.*  Briggs' own damages expert, like Bennis, uses the entire accused lawn mowers as a base for his own damages analysis.  Filing No. 461, Ex. 2, Expert Report of John R. Bone at 58.

Paul Strykowski, Ph.D. is a Professor of Mechanical Engineering at the University of Minnesota who specializes in the study of fluid mechanics or flow analysis. (Filing No. 408, Ex. 5, Strykowski Report, Amended Ex. V, Curriculum Vitae; Ex. 7, Updated Strykowski Report at 53-55.)  He earned his B.S. in mechanical engineering at the University of Wisconsin in 1982, and two Masters Degrees (1983 and 1985) and a Ph.D. (1986) in mechanical engineering from Yale.  *Id.*  Dr. Strykowski's research specialty is fluid mechanics, described in his curriculum vitae as the "fundamental physics and applied fluid mechanics of non-reacting and reacting flows."  *Id.*

Dr. Strykowski has submitted his opinion on the issue of infringement of the '863 patent.  *Id.,* Ex. 7, Strykowski Report.  In his report, Dr. Strykowski describes the function and benefits of the baffle system described in the '863 patent and explains the need in a mower deck "to create airflow under the deck that is conducive for the effective transport of clippings across the lateral extent of the deck to the discharge opening."  *Id.* at 3-4.  Dr.

Strykowski also issued an expert report on the validity of the '863 patent.  *See id.*, Ex. 3.  In his validity report, he addresses the defendants' assertion that the '863 patent is not entitled to the priority date of the original 1995 patent application.  *Id.* at 11-12.  He also concludes that the '863 patent is neither anticipated nor obvious over the prior art.  *Id.* at 34-117.

Garry Busboom is one of the inventors of the '863 patent.  Filing No. 408-2, Deposition of Garry Busboom ("Busboom Dep.") at 24-25.  He is employed as Chief Development Engineer at Exmark and has worked there since 1985.  *Id.* at 15.  He is an engineer with 30 years' experience in the lawn mower industry.  *Id.* at 15-19.  Defendants concede that he is a person of ordinary skill in the field of the invention.  *See* Filing No. 360, Defendant's Brief at 1.  In his Report, Mr. Busboom states his opinion that Schiller's and Briggs' accused products infringe the '863 patent.  Filing No. 408-11, Ex. 18, Updated Report of Garry Busboom at 5-17, 21-56 (expressing opinions that (1) the '863 patent is entitled to the priority date of the original 1995 application; (2) the claim term "adjacent" is not indefinite; (3) the claim term "elongated and substantially straight baffle portion" is not indefinite; and (4) the '863 patent is not anticipated by or obvious in view of the prior art); *see* Filing No. 408-12, Ex. 19, Updated Rebuttal Expert Report of Garry Busboom on Validity at 7.

Defendant Briggs's expert, Denis Del Ponte, has a B.S. in Mechanical Engineering from the University of Wisconsin.  Filing No. 408-13, Ex. 20, Del Ponte Expert report at 6.  He has been employed as a product designer, project engineer, and manager at John Deere since 1974.  *Id.* at 6-7.  Defendant Schiller's expert, Frank J. Fronczak, is a Professor at the University of Wisconsin-Madison in the Mechanical Engineering and the Biomedical Engineering Departments.  Filing No. 410-9, Ex. 21, Expert Report of Frank J. Fronczak at 3.  He has a Doctor of Engineering ("Dr. Eng.") degree in Engineering Design from the

4

University of Kansas, an M.S. degree in Theoretical and Applied Mechanics from the University of Illinois-Urbana, and a B.S. degree in General Engineering from the University of Illinois-Urbana. *Id.* at 4.

II. LAW

The admissibility of expert testimony is governed by the Federal Rules of Evidence and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The district court's "gatekeeping obligation" applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: "(1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003). Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id.* at 860.

When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co.,* 526 U.S. at 147; *Daubert,* 509 U.S. at 589; *United States v. Wintermute,* 443 F.3d 993, 1000 (8th Cir. 2006). A trial court must be given wide latitude in determining whether an expert's testimony is reliable. *See Kumho Tire,* 526 U.S. at 152. This analysis requires that the court make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology . . . can be [properly] applied to the facts in issue." *Daubert,* 509 U.S. at 592-93.

5

The court may consider several factors in determining the soundness of the scientific methodology including: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique; and (4) whether the theory or technique used has been generally accepted in the relevant scientific community. *Id.* at 593-594. Courts must focus on the principles and methodology rather than the conclusion they generate. *Id.* at 595.

"[N]othing in Rule 702, *Daubert*, or its progeny requires 'that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible.'" *Kudabeck*, 338 F.3d at 861 (*quoting Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). Rather, the proponent of expert testimony bears the burden of providing admissibility beyond a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001). When the application of a scientific methodology is challenged as unreliable under *Daubert* and the methodology itself is otherwise sufficiently reliable, outright exclusion of the evidence is "warranted only if the methodology was so altered by a deficient application as to skew the methodology itself." *United States v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004) (brackets omitted) (*quoting United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)).

An expert in a technical field that is pertinent to a patented invention may testify about infringement and validity even though he has never worked with products of the exact type covered by the patent. *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010). With respect to duplicative evidence, a Rule 403 motion may only be brought at trial if it appears that duplicative testimony is being offered. *Argenyi v. Creighton Univ.*, No. 8:09CV341, 2013 U.S. Dist. LEXIS 118121, at *13 (D. Neb. Aug. 19, 2013). Motions in limine under Rule 403 are generally premature. *Id.* Moreover, the opinions of

two experts are not cumulative where their expertise and experience are different. *Michuda v. United States*, No. 8:02CV85, 2003 U.S. Dist. LEXIS 28295, at *4-5 (D. Neb. June 20, 2003).

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir.2002) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). However, it also is true that if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded. *Id.* An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported. *Id.*

The statutory authority for an award of damages in a patent infringement case is 35 U.S.C. § 284, which provides in relevant part that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284; *see Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26-27 (Fed. Cir. 2012) (noting that the minimum damages amount allowable under the statute is the reasonable royalty that the patentee would have received in an arms-length bargain). "The two 'alternative categories of infringement compensation' under section 284 are 'the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining.'" *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1330 (Fed. Cir. 2015) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). The reasonable royalty theory of damages seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing. *Lucent Techs.*, 580

7

F.3d at 1325. The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Id.* at 1324.

The 'willing buyer-willing seller' rule is considered in determining a reasonable royalty under that section. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1157-58 (6th Cir. 1978). It has been defined as the amount that "a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market, at a reasonable profit." *Id.* The fifteen factors set out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971), frame the reasonable royalty analysis.[1] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317

---

[1] Those factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

(Fed. Cir. 2011). "Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation." *Id.*; *see also AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015).

Where small elements of multi-component products are accused of infringement, "it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Cornell Univ. v. Hewlett–Packard Co.*, 609 F.Supp.2d 279, 283, 287–88 (N.D.N.Y. 2009). "[C]alculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics*, 694 F.3d at 67.

---

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*See Georgia Pac. Corp*, 318 F. Supp. at 1120.

The entire market value rule is a narrow exception to this general rule. *Id.* "If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id.*; *see AstraZeneca AB,* 782 F.3d at 1337 ("a patentee may 'assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts'") (quoting *Uniloc USA, Inc.*, 632 F.3d at 1318 (internal quotation marks omitted)). Even when the accused infringing product is "the smallest salable unit," the patentee "must do more to estimate what portion of the value of that product is attributable to the patented technology" if the accused unit is "a multi-component product containing several non-infringing features with no relation to the patented feature." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). Thus, the entire market value rule applies when the accused product consists of both a patented feature and unpatented features; the rule is designed to account for the contribution of the patented feature to the entire product. *AstraZeneca AB,* 782 F.3d at 1338.

A related inquiry involves a situation where a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements. *AstraZeneca AB*, 782 F.3d at 1338-39. In that case, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone. *Id.*; *see Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed.Cir. 2014) ("When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features."). Several of the factors set forth in the *Georgia–Pacific* case bear directly on this issue. *AstraZeneca, AB*, 782 F.3d at 1338-39 (noting that

10

*Georgia–Pacific* factors nine and ten refer to "the utility and advantages of the patent property over any old modes or devices that had been used" and "the nature of the patented invention, its character in the commercial embodiment owned and produced by the licensor, and the benefits to those who used it," respectively and "[f]actor thirteen, which refers to the 'portion of the realizable profit that should be credited to the invention,' embodies the same principle."); *Ericsson, Inc.*, 773 F.3d at 1228 (stating that the *Georgia–Pacific* factors "do take the concepts of apportionment into account to some extent"); *Univ. of Pittsburgh v Varian Med. Sys.*, 561 Fed. App'x 934, 947-48 (Fed. Cir. 2014) (noting that *Georgia Pacific* "addresses that specific problem by requiring the patentee to provide tangible evidence regarding the relative value of his or her invention in combination with, but distinct from, any conventional elements recited in the claim" and relying on *Georgia Pacific* factors 6 ("effect of selling the patented specialty in promoting sales of other products of the licensee; th[e] existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales), 9 & 10 (an assessment of the "utility and advantages of the patent property over the old modes or devices" and "[t]he nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention," respectively) and 13 (an assessment of "[t]he portion of realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvement added by the infringer") to apportion value). Accordingly, "the standard *Georgia–Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *AstraZeneca, AB*, 782 F.3d at 1338 (noting that "[w]hile it is important to guard against compensation for

11

more than the added value attributable to an invention, it is improper to assume that a conventional element cannot be rendered more valuable by its use in combination with an invention"). "[A] patent that combines 'old elements' may 'give[ ] the entire value to the combination' if the combination itself constitutes a completely new and marketable article." *Id.* at 1338-39 (noting that "if the claimed invention only adds an incremental value to the conventional element(s), the damages awarded must also be so limited. But, if the claimed invention adds significant value to the conventional element(s), the damages award may reflect that value.); *see, e.g., Univ. of Pittsburgh v Varian Med. Sys.*, 561 Fed. App'x 934 (Fed. Cir. Apr. 10, 2014) (using *Georgia-Pacific* analysis used to determine damages for infringement of patent covering combination of old beam generator and new RPM system for use in radiation treatment); *Douglas Dynamics, LLC v Buyers Prods.*, 2014 WL 7409503, *8 (W.D. Wisc. Dec. 31, 2014) (using *Georgia-Pacific* analysis to compute infringement damages for patent covering the combination of an old snowplow with a new linkage assembly—the patent was directed at the entire snowplow linkage assembly).

A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, or a running payment that varies with the number of infringing units, in which case it generally has two prongs: a royalty base and a royalty rate. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *see Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27-28 (Fed. Cir. 2012) (noting that the "classic way to determine the reasonable royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee"); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1208 (Fed. Cir. 2010). Where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to

the infringing features of the product, and no more. *Ericsson, Inc.*, 773 F.3d at 1226 (explaining that "[l]ogically, an economist could do this in various ways—by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof"); *see also VirnetX, Inc.*, 767 F.3d at 1326 (No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features).

Licenses may be presented to the jury to help the jury decide an appropriate royalty award. *Ericsson, Inc.*, 773 F.3d at 1227; *see, e.g., Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention . . . ."); *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. at 1120 (finding that "royalties received by the patentee for the licensing of the patent in suit" is a relevant factor for the jury to consider). In attempting to establish a reasonable royalty, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent*, 580 F.3d at 1325. However, identity of circumstances is not required. *Id.* (acknowledging that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty); *Ericsson, Inc.*, 773 F.3d at 1227 (the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility).

    III.    DISCUSSION

The court finds the defendants' motions should be denied. The defendants do not challenge Ms. Bennis's qualifications, only her methodology. The defendants' motion relies on the faulty premise that the patent-in-suit is limited to baffles. In this case, the claimed

invention is a lawn mower that is configured with baffles in a certain way. The accused products are lawn mowers that allegedly meet the limitations of the asserted patent claims.

The proper damages analysis in this case nonetheless requires apportionment between the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claims, standing alone, that is—how much new value is created by the novel combination presented by the patented invention. The apportionment of value between patented and non-patented feature is accounted for in Bennis's report. Essentially, in arriving at a 5% royalty rate, she attributed 5% of the revenue on the accused products to the patented invention, and 95% of the revenue to other factors. In her report and testimony, she appropriately considered the added value attributable to the invention. She appropriately considered the *Georgia Pacific* factors relevant to the inquiry to separate or apportion damages attributable to the patented features contained in the accused device to the exclusion of any damages attributable to unpatented features. Further, defendants' position is considerably weakened by its own expert's reliance on methodology similar to that employed by Ms. Bennis.

The court finds the defendants' objections to Bennis's testimony are properly the subject of either cross-examination, foundational or relevance objections, or argument. The defendants' criticisms go more to the weight than to the admissibility of Bennis's testimony.

With respect to the testimony of Dr. Strykowski and Mr. Busboom, the defendants' arguments are similarly unavailing. The objections have been rendered moot to some extent by this court's findings of invalidity and infringement on the parties' respective motions for summary judgment. The court considered these experts' opinions and testimony in connection with those motions. To the extent that the testimony is relevant to issues that remain in the case (infringement by Briggs with respect to its modified designs and

14

willfulness), the court finds the defendants' Daubert challenges should be denied. Strykowski and Busboom are concededly qualified. Both experts provide detailed explanations of the factual underpinning of their opinions. Their qualifications are similar to the qualifications of the defendants' experts. Similarly, their opinions are based on essentially the same objective bases as the defendants' experts' opinions. The opinions are based on reliable scientific engineering methodology.

The court finds the defendants' objections go to the weight not the admissibility of the evidence. The experts are qualified and will be allowed to testify to the extent their testimony can assist the jury.

IT IS ORDERED:

1. The defendants' joint motion to exclude the opinions of Melissa Bennis (Filing No. 416) is denied.

2. The defendants' joint motion to exclude the testimony of Paul Strykowski and Garry Busboom (Filing No. 354) is denied.

Dated this 28th day of July, 2015

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge