IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EXMARK MANUFACTURING COMPANY INC., | |
| Plaintiff, | 8:10CV187 |
| v. | MEMORANDUM AND ORDER |
| BRIGGS & STRATTON POWER PRODUCTS GROUP, LLC, | |
| Defendant. | |

This matter is before the court after a bench trial on defendant Briggs and Stratton Power Products Group, LLC's ("Briggs's") motion for a judgment of laches, Filing No. 658.[1] This is a patent infringement action initiated on May 12, 2010, by plaintiff Exmark Manufacturing Company, Inc. ("Exmark"), accusing defendant Briggs of infringing claims 1, 2, 6 and 7 of its U.S. Patent No. 5,987,863 ("the '863 patent"). Filing No. 1, Complaint. The patent at issue involves a "Lawn Mower Having Flow Control Baffles and Removable Mulching Baffles." *Id.*, Trial Exhibit ("T. Ex.") 1, '863 Patent. The patent infringement action was tried to a jury from September 8-11, 2015, and September 14-17, 2015, resulting in a compensatory award to the plaintiff for infringement in connection with Brigg's original mower deck in the amount of

---

[1] Also pending is Exmark's Motion in Limine to Preclude Briggs From Presenting New and Untimely Evidence and Arguments Regarding the Prejudice Element of Laches, Filing No. 622. The parties reached an agreement on that motion and it will be denied as moot. *See* Filing No. 643, Laches Proceeding Transcript ("Laches Proc. Tr."), Vol. I at 3-4. In essence Briggs argues that if there is prejudice it has to do only with the fact that it could have designed around the patent earlier and all of the damages that accumulated thereafter would not be in play. Filing No. 659, Briggs's Brief at 39; Filing No. 643, Laches Proc. Tr., Vol. I at , Laches Hearing at 3-4; Filing No. 644, Laches Proc. Tr., Vol. II at 189-90, 244-45.

$24,280,330 and in a finding of willful infringement.[2] See Filing No. 599, Verdict. The court held a bench trial on the equitable laches defense on October 21-22, 2016.[3] See Filing No. 643, Laches Proceeding Transcript ("Laches Proc. Tr."), Vol. I; Filing No. 644, Laches Proc. Tr., Vol. II. The court took judicial notice of the trial record and exhibits. Filing No. 643, Laches Proc. Tr., Vol. I at 6. The following are the court's findings of fact and conclusions of law.[4]

I. FINDINGS OF FACT

Exmark is a manufacturer of commercial lawnmowers located in Beatrice, Nebraska. See Filing No. 611, Trial Transcript ("T. Tr."), Vol. II at 146, 154, 161, 174. Exmark, a wholly-owned subsidiary of the Toro Company ("Toro"), is the owner of the '863 Patent, which is directed to a lawn mower having "flow control baffles" that improve the function of the mower when operating in a side-discharge configuration. See, e.g., Trial Exhibit ("T. Ex."). 1, '863 Patent at 2; Filing No. 156, Memorandum and Order at 1-2.

At trial, Garry Busboom, one of the inventors of the '863 Patent, testified that before his invention, the conventional wisdom was that in order to maximize the cutting

---

[2] Earlier, the court granted Exmark's motion for summary judgment and found that Briggs's original design infringed the '863 Patent. Filing No. 476, Memorandum and Order at 31. The jury was asked to determine damages and willfulness for the original design infringement and also to determine whether Briggs's redesigned mower deck infringed the patent. See Filing No. 599, Verdict.

[3] In a Memorandum and Order dated July 28, 2015, this court found the laches defense was not applicable and denied Briggs's motion for summary judgment on that issue. Filing No. 476, Memorandum and Order at 29-30. The court also granted a motion in limine to preclude testimony on the equitable issues at trial and later denied a motion for reconsideration of that ruling as it related to the plaintiff's alleged delay in bringing suit as it related to damages. See Filing No. 565, Memorandum and Order at 3-4; Filing No. 615, T. Tr., Vol. VI at 1011-12. The court reconsidered those findings after the Federal Circuit issued its decision in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 807 F.3d 1311 (Fed. Cir. 2015), cert. granted 84 U.S.L.W. 3428, (U.S. May 2, 2016) which reaffirmed the continuing validity of the laches defense in patent cases. The court allowed a full presentation of evidence at the bench trial. See Filing No. 643, Laches Proc. Tr., Vol. I; 644, Laches Proc. Tr., Vol. II.

[4] The parties also agree to certain facts. See Filing No. 639, Joint Submission of Deposition Designations and Stipulated Facts ("Stipulated Facts").

2

performance of a side discharge mower, the flow of grass should facilitated around the front of the cutting deck, out of the path of the downstream cutting blades, and out the side opening. Filing No. 613, T. Tr., Vol. IV at 610-11. Busboom stated that he departed from conventional wisdom by designing a side discharge mower that intentionally directed grass clippings into the path of the next cutting chamber. *See* T. Ex. 1, '863 Patent at Fig. 4; Filing No. 611, T. Tr., Vol. II at 210, 222. The resulting mower cut and discharged the grass better, requiring less horsepower. Filing No. 611, T. Tr., Vol. II at 210, 222.

Exmark was a relatively small competitor in the commercial lawnmower industry at the time of the invention. Filing No. 611, T. Tr., Vol. II at 199; Filing No. 612, T. Tr., Vol. III at 505, 512. Before the invention, Exmark was not viewed as a premier manufacturer of commercial mowers. Filing No. 613, T. Tr., Vol. IV at 672-73. After the invention its reputation in the industry improved. Filing No. 612, T. Tr., Vol. III at 597; Filing No. 615, T. Tr., Vol. VI at 1067. Exmark considered its patented flow control baffles to be a very important feature of its mowers and would have liked to be the sole company employing that invention, using it as a market differentiator to justify charging premium prices. *See* Filing No. 611, T. Tr., Vol. II at 174-78; Filing No. 612, T. Tr., Vol. III at 537.

The '863 patent was issued in 1999 and was reexamined by the Patent and Trademark Office ("PTO") in an ex parte proceeding filed by Exmark in 2003. *See* T. Ex. 1, '863 Patent at 1, 12; Filing No. 643, Laches Proc. Tr., Vol. I at 12.[5] In the course of this lawsuit, Briggs and Schiller each separately filed for reexamination of the '863

---

[5] The reexamination certificate, affirming patentability, was issued in November 2004. *See* Filing No. 643, Laches Proc. Tr., Vol. I at 19-20.

patent. See Filing No. 643, Laches Proc. Tr., Vol. I at 47; Filing No. 196, Schiller Motion to Stay. The case was stayed for over two years pending the outcome of these reexaminations. Filing No. 197, Order staying case; Filing No. 215, Order lifting stay. The PTO again found the patent valid. See Ex. 1, '863 Patent 14-17. Exmark has always believed its patent was valid. Filing No. 644, Laches Proc. Tr. at 146-47.

Exmark employee Rodney Benson testified at the laches proceeding. Filing No. 643, Laches Proc. Tr., Vol. I at 9-160. The court generally credits his testimony. He testified he has worked at Exmark since 1999, first as Chief Engineer and later as Engineering Services Manager. *Id.* at 10. His duties included providing support for the engineers, designers, and drafting groups and acting as liaison with counsel on product safety and patent issues. *Id.* at 11-12. He stated he helped engineers or inventors review patent applications and worked with patent attorneys and division counsel. *Id.* at 11. He stated that Exmark did not have its own legal department and that he generally spent about five percent of his time on legal issues. *Id.* at 12.

In 2001, Exmark sued Scag Power Equipment, Inc. ("Scag"), for patent infringement. *Toro Co. v. Scag Power Equip., Inc.*, No. 8:01-cv-279, Filing No. 1, Complaint (D. Neb. May 16, 2001). Scag initially disputed the validity of the patent and accused Exmark of inequitable conduct. Filing No. 643, Laches Proc. Tr., Vol. I at 15-16. Benson testified that the litigation took two years, was expensive and drained Exmark's resources. *Id.* at 17-19. Eventually the case settled for $3.3 million dollars, which barely covered Exmark's expenses. *Id.* at 17-18, 92; T. Ex. 252, Settlement Agreement. As part of the settlement Scag agreed to design a noninfringing mower deck. Filing No. 643, Laches Proc. Tr., Vol. I at 18.

Benson testified that beginning in 2001, he kept a list of potential infringers. *Id.* at 20-21. Exmark employees who observed a potentially infringing product in the field or at a trade show came to him with names of those companies. *Id.* at 21. He compiled and maintained the list, and kept a file on each potential infringer, but did not determine whether the products were actually infringing. *Id.* He stated he presented the list to management and counsel from time to time. *Id.* at 21-22. A memo about the mower industry exposition in 2001 shows that there were 4 potential infringers, including Briggs's predecessor, Ferris Industries, on the list. *Id.* at 23; *see* Ex. 621.

Benson stated only that he and other Exmark employees suspected infringement. *Id.* He had no knowledge of the scope of the potential infringement. *Id.* Benson testified Exmark's resources were being consumed by the Scag litigation at that time and Exmark was not considering suing Ferris. *Id.* at 22, 24. He further stated that Exmark did not view Ferris as a primary competitor prior to 2009—it was not in the top five. *Id.* at 36. He also testified that Exmark did not have knowledge of the scope of Ferris's infringing sales until this litigation. *Id.* at 36-37. Prior to this action, he thought Ferris had approximately 1/7 of Exmark's sales, but it turned out to be much more. *Id.* at 38; see T. Ex. 152, market-share chart.

A summary of notes from a trade show in 2002 lists potential infringers for the '863 Patent and infringers of other patents are listed as well. *See* Ex. 622; Filing No. 643, Laches Proc. Tr., Vol. I at 27. In 2002, Exmark had identified ten potential infringers of the '863 patent. *See* Ex. 622 at 4-5. By 2007, the number of potential infringers of the '863 patent had grown to fourteen. Filing No. 643, Laches Proc. Tr., Vol. I at 30. Briggs, Snapper Pro, Simplicity and Derby were never on the list. *Id.* All of

the ten potential infringers listed prior to 2007 were small competitors and were not touting flow control baffles and quality of cut in their marketing materials. *Id.* at 34.

He stated Exmark had purchased a Ferris mower in 2001, before the list was made, for the purpose of evaluating Ferris' independent suspension system. Filing No. 643, Laches Proc. Tr., Vol. I at 25. The Exmark engineers did not look at the baffles. *Id.* Just prior to filing this action, Exmark bought another Ferris model. *Id.* No Ferris or Briggs models were bought between 2001 and 2009. *Id.* at 26.

Benson testified that prior to 2009, Briggs or Snapper Pro were not suspected as infringers. *Id.* at 32, 112. Between 2004 and 2009, Exmark's efforts were focused on its Lazer product and its legal resources were tied up with a horsepower class action suit. *Id.* at 34, 97. Benson denied that Exmark had been lying in the weeds waiting for damages to build up. *Id.* at 35-36, 182.

In approximately 2008, Briggs began its "iCD cutting system" advertising campaign. *See* Filing No. 643, Laches Proc. Tr., Vol. I at 39; Filing No. 614, T. Tr., Vol. V at 1153; T. Ex. 323. The iCD cutting system campaign was focused on touting the high quality of cut provided by Ferris and Snapper Pro cutting decks. *See e.g.*, T. Exs. 311, 312, 313, 314, 323 (identifying the infringing flow control baffles as a feature contributing to the high quality of cut). Benson testified that the primary impetus for the investigation and lawsuit was that in 2009, Briggs actively pursued the business of Exmark's largest customer, Brickman, emphasizing cut quality and flow control baffles in marketing materials and literature for its iCD system. Filing No. 643, Laches Proc. Tr., Vol. I at 39-42; *see also* Ex. 37, photo of demonstration deck by Ferris; T. Ex. 212, 2009 GIE Expo materials; Filing No. 613, T. Tr., Vol. IV at 687-89 (testimony of Dan Dorn);

6

Filing No. 614, T. Tr., Vol. V at 792-93 (testimony of Melissa Bennis). Exmark learned that Brickman was told that Brigg's cutting deck was equal to Exmark's. Filing No. 643, Laches Proc. Tr., Vol. I at 41.

Exmark then investigated infringement by Briggs with respect to the baffles. *Id.* at 41-42. As a result of its discussions with Brickman, Exmark purchased a Ferris walk-behind mower and a Snapper Pro ZTR mower in the summer of 2009. *Id.* at 40-42. Benson testified he first saw Briggs's advertising information during that investigation. *Id.* at 41. The first pieces of advertising literature in the folder for Ferris and Briggs were 2009 materials. *Id.* at 43.

Exmark marks it mowers with a sticker identifying the patents it owns and has consistently referred to its patented "flow control baffles" it its marketing literature and advertisements. Filing No. 611, T. Tr., Vol. II at 241-43, 255-56. Benson testified that Exmark notified the industry of its patents via the decals on its products and also through the Scag suit notified the industry. Filing No. 643, Laches Proc. Tr., Vol. I at 44. He stated that the commercial mower business is a small industry and most competitors would have known of the Scag litigation. *Id.* at 45. He expects competitors to look at decals and markings on competing products. *Id.* Also, he stated that Exmark emphasized its patented flow control baffles and superior cut quality in its marketing brochures. *Id.* at 44. He testified that it is not common in the industry to send letters to competitors alleging infringement. *Id.* at 45-46. He also stated that when the suit was filed in 2010, there were 5 and a half years left on the patent and Exmark had hope of enjoining further production of the infringing products. *Id.* at 49.

The record shows that Ferris had sold approximately 50 infringing mowers in 1999 and one thousand infringing mowers in 2000. Filing No. 639, Joint Submission of Deposition Designations and Stipulated Facts ("Stipulated Facts") at 7. Some of the infringing mowers sold by Ferris in 2000 were consumer-oriented mowers. *Id.* Exmark sold more than 26,000 mowers covered by the '863 patent in 2002. *See* T. Ex. 529. Benson stated that after Briggs acquired Ferris in 2004, the relationship between Briggs and Exmark was strained because Briggs, who had been a supplier of engines to Exmark, became a competitor. Filing No. 643, Laches Proc. Tr., Vol. I at 102-03.

Garry Busboom testified that Briggs supplied engines to Exmark and by the mid-2000s, Briggs had been a long-standing supplier of engines to Exmark. Filing No. 643, Laches Proc. Tr., Vol. I at 172-75. He stated that Exmark had a concern about having Briggs as a supplier after Briggs bought the Ferris line because once a supplier is also a competitor, Exmark would have to be more guarded about current and future designs. *Id.* at 181-82. Busboom also denied delaying suit to increase damages. *Id.* at 182.

In addition to the Ferris brand, Briggs also sold mowers that have been found to infringe the '863 patent under two other brands, Derby and Snapper Pro. Filing No. 643, Laches Proc. Tr., Vol. I at 111-112; Filing No. 639, Stip. Facts at 6. Benson testified the Derby brand of lawn mowers was not a substantial competitor in the commercial mower industry—it was a consumer brand. Filing No. 643, Laches Proc. Tr., Vol. I at 33, 122-23. Derby was not on Exmark's radar and Exmark did not include Derby in market share or competitive studies. *Id.* Also, he testified Exmark was not aware of potential infringement by Derby. *Id.* at 32, 113. He also testified that Snapper Pro introduced a product using infringing flow control baffles in 2007, and Exmark was

8

not aware that Snapper Pro mowers infringed the '863 patent until 2009. *Id.* at 32, 40, 112, and 156.

This lawsuit was filed on May 12, 2010. [Filing No. 1](), Complaint. Defendants Briggs and Schiller continued to contest the validity of the '863 patent throughout the proceedings in this case. *See* [Filing No. 476](), Memorandum and Order at 1, 25-27; [Filing No. 644](), Laches Proc. Tr., Vol. II at 277. Briggs's employee Harold Redman testified that between 2010 and 2014 Briggs continued to sell out its existing inventory of the infringing products, on advice of counsel, because Briggs believed Exmark's patent was not valid. *Id.* at 277. Further, he stated that if the lawsuit had been filed in 2004, Briggs would still have attacked the validity of the patent, denied infringement, and denied that 5 percent royalty was a fair price for the value of the patent. *Id.* at 92. He also maintains that it is still Briggs's position that Exmark's patent is invalid. *Id.* at 87. Mr. Redman admitted that there was no way to know whether those mower manufacturers selling allegedly infringing mowers had a license for the '863 patent. *Id.* at 281.

The evidence shows that Briggs should have known, and suggests that it in fact knew, about the '863 patent for years prior to the filing of the present lawsuit. *See* [Filing No. 615](), T. Tr., Vol. VI at 1073, 1092-93. Mr. Wenzel admitted that Ferris' policy for clearing new products in the 1996 time frame was "flawed" because it only looked for potential infringement problems at the time the product was introduced and did not look for subsequently issued patents. *Id.* at 1092-93. He testified that he should have known of Exmark's '863 patent. [Filing No. 615](), T. Tr., Vol. VI at 1137-39. Wenzel was deposed in the Scag litigation. [Filing No. 614](), T. Tr., Vol. V at 975-76. The law firm that

represented Scag in that litigation also represented Ferris on a variety of matters, including patents. Filing No. 615, T. Tr., Vol. VI at 1139-40, 1145-46. Wenzel testified that he did not learn of Exmark's patents by virtue of the Scag litigation. *Id.* The court discredits that testimony. Wenzel's testimony is contradicted by an email he later sent to a Ferris distributor stating that Ferris did not want to make a "big splash about [the mulch kits it was introducing] because Toro was aggressively pursuing litigation." *Id.* at 1077-78.

Further, the record shows Briggs, and its predecessor, Ferris, purchased several Exmark mowers covered by the '863 patent over the years and at the time this lawsuit was filed, it had at least 3 such mowers in its possession. Filing No. 615, T. Tr., Vol. VI at 1093-98. All had patent marking decals. *Id.* at 1093-97; T. Exs. 46, 47, and 48. Briggs collects literature regarding its competitors' products at trade shows. Filing No. 615, T. Tr., Vol. VI at 1112-13. At the time this lawsuit was filed, Briggs had in its possession at least nine Exmark brochures that refer to "patented flow control baffles." *Id.* at 1123-34; *see, e.g.,* T. Exs. 430, 443, 445, 450, 457, 464, 466, 471, 474.

The record shows Briggs began working on its modified baffle design in February 2010. Filing No. 616, T. Tr., Vol. VII at 1383-84, 1403-04; 1447. Briggs did not begin production until five and one half months after the lawsuit was filed. *Id.* at 1422, 1383. 1409. Mr. Robert Laurin testified that the purpose of the redesign was to increase the manufacturability of the mower deck. *Id.* at 1383. He stated "[f]rom early 2010 I was asked to look at a—some better ways to manufacture our product." *Id.*; *see also id.* at 1403-04.

The record also shows that Briggs had undergone a redesign process with respect to its mower decks in about 2008. *Id.* at 1383; Filing No. 615, T. Tr., Vol. VI at 1050. It hired a third-party consulting company to conduct a flow analysis to assist in the redesign. Filing No. 616, T. Tr., Vol. VII at 1388-90. That redesign did not result in the "re-curve" baffle design that Briggs adopted in 2010. *Id.* The court finds it reasonable to infer that the "re-curve" design was not available to Briggs in 2008. *See* Filing No. 615, T. Tr., Vol. VI at 1062-64; Filing No. 616, T. Tr., Vol. VII at 1383-84, 1403-04, 1421, 1447.

II. CONCLUSIONS OF LAW

A. Law

"[L]aches remains a defense to legal relief in a patent infringement case because 'Congress codified a laches defense in 35 U.S.C. § 282(b)(1).'" *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 2014-1856, 2016 WL 1258153, at *2 (Fed. Cir. Mar. 31, 2016) (quoting *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1321 (Fed. Cir. 2015) (en banc), *cert. granted*, 84 U.S.L.W. 3428 (U.S. May 2, 2016).[6] When found, laches bars retrospective relief for damages accrued prior to filing suit but does not bar prospective relief. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (en banc).

"To prevail on a defense of laches, a defendant must establish that (1) the plaintiff's delay in filing a suit was 'unreasonable and inexcusable;' and (2) the defendant suffered 'material prejudice attributable to the delay.'" *Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1002 (Fed. Cir. 2016) (quoting *A.C. Aukerman,* 960 F.2d at 1028);

---

[6] The Supreme Court granted certiorari on the following issue: "[c]an— and to what extent— does the defenses of laches bar a claim for patent infringement brought within the Patent Act's six-year statutory limitations period, 35 U.S.C. § 286?" *SCA Hygiene Prods.,* 84 U.S.L.W. at 3428.

11

*see also SCA Hygiene,* 807 F.3d at 1317. If these prerequisite elements are met, a court must then balance "all pertinent facts and equities," including "the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability" before granting relief. *A.C. Aukerman*, 960 F.2d at 1034. ("for laches, the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit"). Laches is not established, however, by showing undue delay and prejudice— "[t]hose factors merely lay the foundation for the trial court's exercise of discretion." *A.C. Aukerman*, 960 F.2d at 1036.

For purposes of a laches defense to an infringement claim, a patentee's delay is measured from the time it knew or reasonably should have known of alleged infringing activities to the date of suit. *A.C. Aukerman*, 960 F.2d at 1032. "Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense" and "[s]uch prejudice may be either economic or evidentiary."[7] *Id.* at 1033. "Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.* It is not economic prejudice to pay damages from infringing sales of products generating a profit over a longer period of time resulting from delay. *See A.C. Aukerman*, 960 F.2d at 1033 (stating "[economic] damages or monetary losses are not merely those attributable to a finding of liability for infringement" because "[e]conomic prejudice would then arise in every suit.") (citation omitted)). Instead, "[t]he courts must look for a change in the economic position of the alleged infringer during the period of

---

[7] By agreement of the parties, evidentiary prejudice is not at issue. *See supra* at 1 n.1.

12

delay." *Id.*; *see also Hearing Components, Inc. v. Shure Inc.,* 600 F.3d 1357, 1376 (Fed. Cir. 2010) (holding that evidence showing that defendant would not have acted differently if sued earlier negated its assertion of economic prejudice), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120, 2124 (2014).

A presumption of laches arises where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity. *SCA Hygiene Prods.*, 807 F.3d at 1317. A presumption has the effect of shifting the burden of going forward with evidence, not the burden of persuasion. *Id.* at 1317-18. "This presumption of laches may be rebutted if the plaintiff 'offer[s] evidence to show an excuse for the delay or that the delay was reasonable' or by offering 'evidence sufficient to place the matters of defense prejudice and economic prejudice genuinely in issue.'" *A.C. Aukerman*, 960 F.2d at 1038. If the plaintiff makes a showing that there is a genuine dispute as to either delay or prejudice, "the presumption dissolves and the defendant is then 'put to its proof on both factors' and 'must affirmatively prove (1) unreasonable and inexcusable delay and (2) prejudice resulting from that delay.'" *Lismont*, 813 F.3d at 1003 (quoting *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293 (Fed. Cir.1992)). The factors underlying a laches determination—unreasonable delay and prejudice—are factual in nature. *Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1002 (Fed. Cir. 2016); *see A.C. Aukerman*, 960 F.2d at 1035 (referring to them as "the underlying factual elements" of laches); *Hemstreet*, 972 F.2d at 1292 ("[Laches] ultimately turn[s] on underlying factual determinations.").

The Federal Circuit has "previously recognized that '[a] patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing that he or she was engaged in "other litigation."'" *Lismont*, 813 F.3d at 1004 (quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 876–77 (Fed. Cir. 1991)). For other litigation to excuse a plaintiff's delay, however, the defendant must have adequate notice of the other proceedings as well as plaintiff's intention to pursue its patent rights upon completion of the other proceedings. *Vaupel*, 944 F.2d at 877. "What is important is whether [the defendant] had reason to believe it was likely to be sued." *Vaupel*, 944 F.2d at 878; *see A.C. Aukerman*, 960 F.2d at 1039 ("If a defendant is, for example, aware of the litigation from other sources, it would place form over substance to require a specific notice."). Other recognized justifications for a delay in bringing suit include negotiations with the accused, possibly poverty and illness under limited circumstances, wartime conditions, extent of infringement, and a dispute over ownership of the patent. *A.C. Aukerman*, 960 F.2d at 1033. "The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant." *Id.* "A patentee may also defeat a laches defense if the infringer 'has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Id.* (quoting *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir. 1986)). "Conscious copying may be such a factor weighing against the defendant, whereas ignorance or a good faith belief in the merits of a defense may tilt matters in its favor." *Id.*

      B.     Discussion

The court finds Briggs has not sustained its burden of showing that it is entitled to the equitable defense of laches. Briggs has not shown that Exmark's delay was unreasonable or inexcusable or that Briggs has been materially prejudiced by the delay. The court finds that the facts do not support the application of a presumption of laches, and if they did, it was rebutted because the delay was reasonable and/or justified, and there has been no showing of economic prejudice.[8]

Even if Exmark were shown to be less than diligent in investigating and/or preventing Briggs's infringement of the '863 patent, its delay in filing suit was not unreasonable or unjustified. The evidence shows that Exmark was involved in costly litigation against Scag and did not have the resources or motivation to pursue another costly infringement action. It was not aware of the scope or extent of Briggs's infringing conduct until Briggs attempted to take away its biggest customer and began aggressively marketing the flow control baffle design.

Briggs argues that, but for Exmark's delay, it would have stopped infringing sooner and would not be facing as large of a damages award. It argues that, had it been informed of alleged infringement sooner, it would have designed around the patent earlier. That argument fails to consider the fact that Briggs reaped the benefit of the infringing sales during that period. The court is not persuaded that Briggs, if made aware of possible infringement, would have modified its mower deck with a non-

---

[8] To get the benefit of the presumption of laches, Briggs would have had to show Exmark was on notice of its infringement more than six years before filing suit, or by May 12, 2004. However, the evidence relating to that time period does not establish that plaintiff had actual knowledge of Briggs's infringing activity, nor does it show the kind of "pervasive, open, and notorious activities" that would lead a reasonable patentee to suspect infringement and thus trigger a duty to investigate. Briggs was then a small competitor. Exmark had been involved in litigation against Scag in 2002-2003 and in reexamination proceedings in the PTO until November 2004.

infringing design. Even the modified baffle it designed in 2010 presented a close case of infringement, as reflected in this court's denial of summary judgment on the issue. Mr. Redman testified that if Exmark had filed suit in 2004, Briggs would have attacked the validity of the patent, denied infringement with respect to its original baffle design, and challenged 5% as a reasonable royalty.

Throughout five years of litigation, Briggs has disputed the validity of the '863 patent. Filing No. 476, Order; Filing No. 566, Order Denying Reconsideration. Mr. Redman of Briggs admitted that if Exmark had filed suit in 2004, Briggs still would have attacked the validity of the '863 patent, would have denied that even its original baffle design infringes the '863 patent, and would have denied that a 5% reasonable royalty was fair compensation for the invention. Filing No. 644, Laches Hearing at 273, 278.

The record shows that some Exmark employees suspected infringement as a result of seeing a competing mower at a trade show and consequently Ferris was put on a list of potential infringers in 2002. Thereafter, Exmark sued its main competitor and later filed for reexamination of the patent. Ferris, which was later acquired by Briggs, was not a major competitor at that time. It was not until 2009 that Exmark became aware of facts indicating Briggs was infringing its patent.

Because the court finds Briggs has not sustained its burden to show that Exmark unduly delayed filing suit, did so without justification, and prejudiced Briggs thereby, the court need not balance the equities. The court notes however, that the balance of the equities would favor Exmark in any event.

Briggs's own conduct weighs against a finding of laches. As noted, there is evidence to support conscious copying by Briggs. The jury found Briggs's conduct was

willful.  See Filing No. 599, Verdict.  The evidence shows that it is more likely than not that Briggs was actually aware no later than 2002 of an unjustifiably high risk of infringing the '863 patent.  The testimony that Briggs was not aware of the risk by virtue of the Scag litigation stretches credulity.  The fact that Scag's lawyers represented Mr. Wenzel at the deposition shows that they believed there was no conflict of interest in representing both Scag and Mr. Wenzel concurrently.  The identity of the patent claims at issue in the Scag litigation was public information, and there is no basis to conclude that the lawyers representing both Scag and Mr. Wenzel would have refused to disclose to Wenzel the patents that were at issue in that case.  Mr. Wenzel was familiar with the flow control baffles on Ferris mowers in 2002, and the relevance of the '863 patent would have been evident to him from the front of the patent alone.

The court finds there is no basis to conclude that Briggs would have stopped infringing sooner had Exmark filed a lawsuit sooner.  Having copied the invention, Briggs should have been diligent in looking for a patent that covered that invention. Instead, Briggs either deliberately or recklessly ignored the risk of infringing the '863 patent.

Further, the record shows that Exmark has suffered, and Briggs has benefitted, from Exmark's delay in filing suit.  Even though Briggs's infringing conduct began in 1999, Exmark has only been permitted to recover damages from and after May 12, 2004.  Briggs benefitted from the use of Exmark's invention beginning in late 1998 when it commercialized the infringing mowers (before the '863 patent even issued) but was only required to compensate Exmark for its use of that invention from May of 2004 forward.

17

The court does not credit the evidence that Briggs could have, and would have introduced a low-cost, acceptable, non-infringing alternative any earlier than 2010. When the Scag litigation ended in 2003, Scag redesigned its mower deck to a design that was clearly noninfringing. Briggs did not modify its decks at the time, nor did it adopt a clearly non-infringing design in 2010.

Any delay by Exmark is excused by its reasonable decision to forego suing small competitors due to the enormous cost of patent litigation. Exmark had put the industry on notice of its patent through its markings and marketing materials, and the industry was made aware of its assertion of its patent rights through the Scag litigation. The commercial lawncare industry is a small enough industry that most competitors would have been aware of patent litigation. Briggs/Ferris was specifically aware of Exmark's assertion of its patent rights because Ferris's president was in fact deposed in that litigation. Accordingly,

IT IS ORDERED:

1. Exmark's Motion in Limine to Preclude Briggs From Presenting New and Untimely Evidence and Arguments Regarding the Prejudice Element of Laches (Filing No. 622) is denied as moot.

2. Defendant Briggs and Stratton Power Products Group, LLC's motion for a judgment of laches (Filing No. 658) is denied.

Dated this 11th day of May, 2016.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge