IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EXMARK MANUFACTURING COMPANY INC., | 8:10CV187 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| BRIGGS & STRATTON CORPORATION, | |
| Defendant. | |

This matter is before the Court on a motion to exclude expert testimony filed by the defendant Briggs & Stratton Corporation ("Briggs & Stratton"), Filing No. 757. This is an action for patent infringement that was remanded to this court after being affirmed in part and reversed in part by the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). See *Exmark Mfg. Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1348-54 (8th Cir. 2018).

I.   BACKGROUND

As relevant to this motion, the Appeals Court found error in the Court's denial of Briggs & Stratton's motion for a new trial and remanded for a new trial on damages. *Id.* at 1351. It rejected Briggs & Stratton's argument that the Court erred in allowing Exmark to apportion the value of the patented improvement and conventional components of the multicomponent product through the royalty base rather than the royalty rate. *Id.* at 1348. Further, the Appeals Court approved Exmark's use of the accused lawn mower sales to as the royalty base. *Id.* at 1349. However, the Court found Exmark's damages expert Melissa Bennis's opinion was inadmissible "as it failed to adequately tie the expert's

proposed reasonable royalty rate to the facts of the case," stating that the expert "plucked the 5% royalty rate out of nowhere." *Id.* at 1350-51.

In preparation for the new trial on damages, Exmark obtained a second report from Ms. Bennis. Filing No. 760-2, Ex. 1, June 1, 2018, Expert Report and Disclosure of Melissa A. Bennis ("Bennis Rep."); Filing No. 760-3, Ex. 2, Transcript of Melissa Bennis's July 17, 2018, ("Bennis Dep."). Defendant moves to exclude the Bennis's testimony, arguing that her second apportionment calculation is arbitrary and unreliable. Defendant focuses its criticism on (1) the apportionment analysis that is based on the patented invention's contribution to the sale of the patented mowers; and (2) the comparative value analysis related to Briggs & Stratton's patented suspension technology. It also challenges Bennis's reliance on settlement agreements, arguing the agreements were based on the 5% royalty rate in the first trial of this case that was later overturned by the Federal Circuit.

The Court has reviewed the report, deposition, and related evidence. In her second apportionment report, Bennis analyzes the sales and profitability of the products incorporating the patent-in-suit. She further examines the competitive relationship between Exmark and Briggs & Stratton, and analyzes the potential for lost sales by Exmark and for price erosion due in part to Briggs & Stratton's infringement. She analyzes three approaches to valuation of the invention: (1) the income approach (which focuses on the income and profitability associated with the patented and infringing mowers), (2) the market approach (which focuses on licenses involving the '863 patent and other licenses in the industry), and (3) the cost approach (which focuses on alternatives available to the infringer at the time the infringement began).

She also analyzes the benefits of the patented technology and provides justification for why and how the '863 patent contributes to quality of cut, productivity, and price in relation to value. She bases her conclusions on documents, technical expert analysis, and testimony from both Exmark and Briggs and Stratton witnesses. Filing No. 760-2 at 30-55.

Further, she gives credit to other features that also contribute to quality of cut, productivity, and price/value. She analyzes a Cutting Deck Study that found high blade speed and the shape of the flow control baffle to be the two most important characteristics in providing a high quality of cut. *Id.* She found that four characteristics contribute to quality of cut and recognized that three of the characteristics also relate to blades and one relates to the shape of the deck. *Id.* at 47. Based on the Cutting Deck Study, her review of the evidence, and conversations with Exmark, it was reasonable to treat such different aspects of blades together. *Id.* 30-48; Filing No. 760-4, Ex. 3, Summary Report of Wiese Research Associates, Inc.'s 1995 Landscape Contractors/Lawn Maintenance Product Positioning Study ("Wiese Study") at 196. She also explained, based in part on testimony by Exmark personnel, that the baffle can improve blade performance by preventing the blades from slowing down. Filing No. 760-3 at 198.

In analyzing the second apportionment percentage, Ms. Bennis also considered the fact that fact that "at the time of the hypothetical negotiation, . . . very few patents existed on inventions that would give a commercial mower a competitive advantage in terms of quality of cut and productivity." Filing No. 760-2 at 47. Ms. Bennis's 33-50% second apportionment calculation is the last step in a detailed, multi-step apportionment

3

analysis. *Id.* at 48. Her opinions are supported by market studies, thorough discussions with sales and marketing personnel, witness testimony, and other sources of information.

Ms. Bennis explicitly considers other non-patented elements of a mower in her apportionment analysis, including deck size, engine type, floating decks, blade brakes, blade clutches, parking brakes, caster wheels, drive levers, electric start, mulching capability, and tires. She explains that her analysis focuses on fewer factors than Briggs's expert's analysis because the factors on which she relies (cut quality, durability and value) are the three product-specific factors that are most important to buying decisions, with the dealer also playing an important role. *Id.* at 41. She also explains that other factors (those receiving a score under 90/100 in the Wiese report) are factors that tend to come into play only after the customer is satisfied with the first four factors. *Id.* at 40-41. Those factors have less to do with which company's mower a person buys than to the specific mower within one company's lineup of available products that a person buys. *Id.* at 41.

Many of these other factors (such as floating decks smaller than 48", blade brakes, electric blade clutches, parking brakes, foam-filled front caster tires, low tension drive levers, and electric start) were not listed as applicable to riding mowers, which is important considering that, as explained by Briggs's expert, John R. Bone, a large percentage (80-90%) of the revenue associated with the patented and accused mowers is generated by riding mowers. *Id.* at 41-42. Still other factors (e.g. mulching capability, tires, service contracts and financing availability), are commonly available from most manufacturers or dealers, and generate little to no competitive advantage. *Id.* at 42. She states that her analysis is consistent with the understanding that a small number of factors determine

4

which brand of lawn mower a consumer buys, while other less important features may determine the particular model of a specific brand that a customer chooses. *Id.*

Ms. Bennis provided further reasons why she chose to focus on the four factors that received a score of 90/100 or greater in the Wiese Report: it was (i) consistent with what the Wiese Report itself said was reliable; (ii) consistent with her discussions with Exmark personnel; and (iii) consistent with Briggs's expert's methodology. *Id.* at 41. Ms. Bennis explained in her report that not all of the most important factors would have equal value, but she apportioned them as if they did to perform a conservative analysis. She analyzed a Cutting Deck Study that found high blade speed and the shape of the flow control baffle to be the two most important characteristics in providing a high quality of cut. *Id.* at 47-48. Although four other characteristics were found to contribute to quality of cut, Ms. Bennis recognized that three of the characteristics also related to blade dimensions and one related to the shape of the deck.

In her analysis of the apportionment percentage, Ms. Bennis also took into account the fact that "at the time of the hypothetical negotiation, . . . very few patents existed on inventions that would give a commercial mower a competitive advantage in terms of quality of cut and productivity." *Id.* at 47. She compares the price of the patented invention to its added value. In addition, Ms. Bennis compares the value of the '863 patent to Briggs' suspension technology. That testimony serves three primary purposes: (1) it directly compares the value of two patented technologies in Briggs' mowers; (2) it highlights the value of the '863 patent to mower characteristics like quality of cut, productivity, and value, by showing that it is even more valuable than Briggs' highly promoted and valued suspension system; (3) because Briggs itself has attributed specific

5

"selling values" to its own suspension system, the analysis allows Ms. Bennis to use Briggs' own figures to value the '863 patent (which the evidence shows is more valuable than suspension). *Id.* at 49-55. That testimony shows that Exmark's flow control baffle invention is relatively inexpensive to implement but has significant impact as an improvement. There is evidence that the settlements she relies on were not based on the 2015 now-vacated jury verdict. Filing No. 760-8, Ex. 7, Judy Altmeier Dep. at 11-12 (regarding Schiller settlement).

Briggs's expert, John R. Bone, admitted that it was not necessary to assign a specific value to every possible aspect of a mower to provide a reasonable royalty opinion. Filing No. 765-4, Ex. 4, Deposition of John R. Bone ("Bone Dep.") at 78, 109. Bone provided a similar analysis, assessing the value of the invention as compared to twenty-four other factors he claims affect quality of cut. His testimony has shortcomings similar to Bennis's.

II. LAW

District courts serve a gatekeeper function, ensuring that expert testimony is reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); Fed. R. Evid. 702. Reliability requires that an expert be qualified to render the opinion and that the methodology underlying the conclusions is valid. *Daubert*, 509 U.S. at 589-90. Expert opinion evidence is relevant if the reasoning or methodology in question is applied properly to the facts of the case. *Id.* at 591-93. While Federal Circuit law applies to patent claims, the admissibility of expert testimony related to them is generally governed by the law of the regional circuit. See *Research Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255 (Fed. Cir. 2008). In the Eighth Circuit, courts should resolve doubts

6

regarding the usefulness of an expert's testimony in favor of admissibility. *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998); see also *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 448 (8th Cir. 2008) (Rule 702 "is one of admissibility rather than exclusion"). The Eighth Circuit explains that Rule 702 actually reflects a relaxation of the traditional barriers to opinion testimony and favors admitting expert testimony. *In re Prempro Prods. Liab. Litig. (Scroggin)*, 586 F.3d 547, 565 (8th Cir. 2009). Questions such as the weight to be given to certain testimony and the credibility of the evidence relied on by an expert are questions properly tested during cross-examination and ultimately decided by the jury. *E.g. Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

On a finding of infringement, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. A reasonable royalty is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began. *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (describing the hypothetical negotiation or the "willing licensor-willing licensee" approach). The burden of proving damages falls on the patentee. *Id.* at 1324.

When a patented invention adds incremental value to an end product, the patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product. *Exmark*, 879 F.3d at 1348. Such apportionment can be done through a thorough and reliable analysis to apportion the royalty rate. *Id.* at 1348-49 (stating the one way to apportion is through a proper analysis of the factors outlined in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.

7

Supp. 1116, (S.D.N.Y. 1970)). An infringer's sales as the royalty base "is consistent with the realities of a hypothetical negotiation and accurately reflects the real-world bargaining that occurs, particularly in licensing." *Id.* A damages expert must "adequately tie the expert's proposed reasonable royalty rate to the facts" of the case. *Id.* at 1349.

"Any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Lucent*, 580 F.3d at 1325 (internal quotes omitted); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[E]stimating a reasonable royalty is not an exact science). The record may support a range of reasonable royalties, rather than a single value and there may be more than one reliable method for estimating a reasonable royalty." *Summit 6, LLC*, 802 F.3d at 1296; *see also VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("we have never required absolute precision in this task; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty").

III. DISCUSSION

The Court finds Briggs & Stratton's motion to exclude Ms. Bennis's testimony should be denied. In her second report, Bennis adds additional detail to her earlier report, more particularly tying her opinions to the facts of the case. Bennis clearly took the non-patented elements of the product into account. She considered that many factors may affect the value or profitability of a mower, and then explained why it is proper to focus on a subset of product characteristics in calculating her reasonable royalty opinion. The Court finds her methodology is reliable and consistent with much of Briggs & Stratton's expert's analysis. Bennis's report addresses the shortcomings noted by the Appeals Court and her opinions are now supported by a more thorough analysis.

In accordance with the Federal Circuit's directive, Bennis's updated report explains in detail how she arrived at a 5% reasonable royalty. She adequately ties the proposed royalty rate to the facts of the case. Her analysis of three approaches to valuation of the invention independently and collectively support a 5% reasonable royalty. Bennis also addresses the comparative value and benefits of the '863 patent and Briggs' suspension system using Briggs' own valuation documents as support.

Because any reasonable royalty analysis necessarily involves an element of approximation and uncertainty, the Court finds that Bennis's analysis is reliable and relevant. In her report, she does more than "pluck [her] 5% royalty rate out of nowhere." Her revised report contains more than a superficial recitation of the *Georgia-Pacific* factors.

Briggs's criticism of her opinion goes more to the weight than to the admissibility of the evidence and can be the subject of cross-examination at trial. Her methodology is similar to that employed by Briggs & Stratton's expert. Bone admits that many of his disagreements with Ms. Bennis are about the weight given to various pieces of evidence. Accordingly,

IT IS ORDERED that the defendant's motion to exclude the testimony of Melissa Bennis (Filing No. 757) is denied.

Dated this 12th day of October, 2018.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge
